**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

**MICHAEL K. SCHAAF,**

                                 **Plaintiff,**                  **6:18-cv-00445 (NAM/ATB)**

**v.**

**NEW YORK STATE DEPARTMENT OF
TRANSPORTATION,**

                                 **Defendant.**

---

**Appearances:**

*For Plaintiff:*
James D. Hartt, Esq.
70 Linden Oaks, Third Floor
Rochester, New York 14625

*For Defendant:*
Letitia James,
Attorney General of the State of New York
Brian Matula, Assistant Attorney General
The Capitol, Albany, New York 12224

**Hon. Norman A. Mordue, Senior United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

Plaintiff brings this action against Defendant New York State Department of Transportation ("DOT"), alleging that he suffered employment discrimination and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290–301. (*See* Dkt. No. 1). Now before the Court is Defendant's motion for summary judgment.

(Dkt. No. 21). Plaintiff opposes the motion, (Dkt. No. 26), and Defendant has submitted a reply, (Dkt. No. 29). For the reasons set forth below, the motion is granted in part an denied in part.

## II. FACTS[1]

### A. Plaintiff's Employment

Plaintiff worked as an Equipment Operator Instructor for the DOT, which mainly entailed training employees to use equipment. (Dkt. No. 21-2, ¶ 1). In that position, he was employed within Region 2, which included the counties of Hamilton, Fulton, Montgomery, Herkimer, Oneida and Madison and numerous DOT facilities within these counties. (*Id.*, ¶ 2). Plaintiff was stationed at a DOT building complex in Utica, but he considered his "home base" for work to be his truck. (*Id.*, ¶ 3). Plaintiff's schedule varied on a daily basis depending on the weather, the needs of DOT, and staffing. (*Id.*, ¶ 4). Plaintiff was never in one location for very long; he would travel alone in his truck during the day, and on some occasions, transport another employee to a work site. (*Id.*, ¶ 5). Plaintiff's supervisor at all relevant times was Steven Chaisson. (*Id.*, ¶ 6). Plaintiff received assignments from Mr. Chaisson on a weekly basis and traveled to the geographic area to which he was directed in order to complete those assignments. (*Id.*, ¶ 7). Plaintiff received positive performance evaluations throughout his employment. (*See* Dkt. No. 26-10).

### B. Plaintiff's Religion

In 2014, Plaintiff began his conversion to Islam. (Dkt. No. 21-2, ¶ 12). Plaintiff testified that he started wearing a kufi (a short, rounded skullcap) in 2015 or 2016, which he felt drew him closer to the Muslim faith. (Dkt. No. 21-5, pp. 17–18). Plaintiff wore the kufi when

---

[1] The facts have been drawn from Defendant's statement of material facts, (Dkt. No. 21-2), Plaintiff's response and counterstatement of material facts, (Dkt. Nos. 26-1, 26-2), and the attached exhibits, depositions, and declarations.

2

praying, which he tried to do five times a day. (*Id.*, p. 15). Plaintiff also occasionally wore the kufi inside DOT facilities. (*Id.*, p. 17).

    **C.    Workplace Incidents**

Plaintiff testified he experienced a number of incidents with other DOT employees that reflected religious discrimination. Plaintiff testified that in December 2016, as he walked into work wearing his kufi, Chris Basile remarked "hey, nice beanie," which Plaintiff interpreted to be a derogatory remark regarding his kufi. (Dkt. No. 21-5, p. 48). Plaintiff's supervisor, Mr. Chaisson, states that he became aware of the incident and believed it had been addressed by Mr. Basile's supervisor. (Dkt. No. 21-3, ¶ 18). Carol Entwistle, the Administrative Services Director, testified that she did not believe Mr. Basile was disciplined for the "beanie" comment. (Dkt. No. 21-6, p. 44).

Plaintiff testified that on another occasion that month, Rich Dobroziga said to him, "I'm not working with that fucking Muslim," and repeated it three times. (Dkt. No. 21-5, p. 49). Plaintiff was wearing his kufi at the time. (*Id.*, p. 51). Plaintiff testified that he reported the incident to Mr. Chaisson. (*Id.*, p. 53). Mr. Chaisson states that he does not recall ever having a conversation with Plaintiff about this incident. (Dkt. No. 21-3, ¶ 20). Ms. Entwistle testified that Mr. Dobroziga was interrogated about the incident, but he retired from DOT before any penalties were imposed. (Dkt. No. 21-6, p. 22).

Plaintiff testified that on January 7, 2017, David Zamiello interrupted him while he was reading prayers in the work cafeteria. (Dkt. No. 21-5, pp. 28–30). According to Plaintiff, Mr. Zamiello put his hand on Plaintiff's kufi and said something derogatory in nature. (*Id.*, p. 29). Plaintiff pulled away and stood up, feeling that he had been attacked. (*Id.*, pp. 28–29). Mr. Chaisson states that he was informed about a "physical altercation" between the two men, and that both were issued Notices of Discipline. (Dkt. No. 21-3, ¶ 18). Ms. Entwistle testified that

3

Mr. Zamiello was interrogated about the incident, but he was not disciplined for his conduct. (Dkt. No. 21-6, pp. 25–26).

Plaintiff testified that, on another occasion that month, he attempted to shake hands with Steven Cogden, who said "I don't shake fucking Muslims' hands because they wipe their ass with their bare hand." (Dkt. No. 21-5, p. 57). Mr. Chaisson states that, upon learning of the incident from Plaintiff, he immediately called Mr. Cogden's supervisor and asked him to address the incident. (Dkt. No. 21-3, ¶ 18). Mr. Chaisson believes that Mr. Cogden was formally disciplined as a result of his statement. (*Id.*).

According to Plaintiff, Marc Bonnaci once told him that he should change his name to "Shama Llama Louie" because of his Muslim faith. (Dkt. No. 21-5, p. 77). Plaintiff testified that he asked Mike Murphy, an engineer at DOT, to tell Mr. Bonnaci to stop, but Mr. Murphy "just laughed and did nothing." (*Id.*). Plaintiff testified that, another time in the fall of 2017, Ron Cyr put Plaintiff's kufi on his own head and stretched it out like it was a joke. (*Id.*, p. 93).

Plaintiff testified that, on another occasion in 2017, Willie Mack knelt to the ground and pantomimed prayer, which Plaintiff felt was extremely derogatory. (Dkt. No. 21-5, p. 81). Plaintiff testified that he reported the incident to Mr. Chaisson and Ms. Entwistle. (*Id.*, p. 84). Mr. Chaisson states that he does not recall ever discussing this incident with Plaintiff. (Dkt. No. 21-3, ¶ 19).

Plaintiff also testified that some DOT employees posted "threatening stuff about Islam" on his Facebook account, including guns and bullets. (Dkt. No. 21-5, p. 142). According to Plaintiff, all of the treatment he received caused him "extreme anxiety" and to fear for his life. (*Id.*, pp. 143, 169).

4

### D.  Formal Complaints

On February 1, 2017, Plaintiff spoke with the DOT affirmative action officer, Tiki Lee, regarding the workplace incidents. (Dkt. No. 21-7).  On February 7, 2017, Ms. Lee filled out a DOT Internal EEO/Discrimination complaint form, which specifically mentioned the incidents with Mr. Zamiello and Mr. Dobroziga. (*Id.*).

On March 23, 2017, Plaintiff filed a complaint with the New York State Division of Human Rights, alleging that DOT employees had harassed him because of his religion. (Dkt. No. 26-14).  After an investigation, Julia B. Day, the Regional Director of the New York State Division of Human Rights, found probable cause to support the allegations in the complaint. (Dkt. No. 26-9).  In a report dated August 31, 2017, Ms. Day determined that:

> Complainant maintains that he is Muslim.  The investigation showed Respondent's employees were aware that complainant had recently converted to Islam.  Complainant maintains that comments were made to complainant that a reasonable person would find offensive; including calling him a "terrorist", accusations that he would join Isis, Complainant being referred to as "fucking Muslim", and those indicating that they would not want to work with Muslims or shake Complainant's hand.  Respondent maintains that Complainant was not offended by any of the alleged comments or acts that had occurred at the time, and instead participated in the alleged activity he now maintains was offensive, and that Complainant was a jokester that engaged in a mutual exchange of sexual innuendo in the workplace.  Respondent maintains that there were allegations that complainant had made offensive inappropriate comments about a coworker's national origin; however, Complainant denied this.
>
> Even in taking both parties versions in account there appears to be a culture of sexual innuendo and religious slurs being used in the workplace.  The investigation showed that on at least some of the occasions, a supervisor was present and did not intervene.  The investigation showed that respondent; a state agency, had provided mandated yearly training to employees on harassment and/or diversity training, which, apparently, outlines the mechanism for reporting discrimination in the workplace; however, although Respondent acknowledged that it received Complainant's internal complaint of creed discrimination and the Division requested the internal investigation into Complainant's complaint, Respondent was either, unwilling or unable, to produce a copy of the internal investigation to the Division, which would cause one to question whether Respondent exercised reasonable care and followed through on its own internal process upon receiving Complainant's internal complaint.

5

> The investigation showed that there are issues of material fact remaining, including but not limited to whether complainant was subjected to a hostile work environment on the basis of his creed or whether or not he was a willing participate in the conduct he now complains of; whether or not respondent could be deemed to have known of a hostile work environment and condoned it by failing to cure the environment from discriminatory animus; and whether Respondent exercised reasonable care in the handling of Complainant's internal complaint. These issues of material fact are best resolved in the context of a full public hearing; where there is sworn testimony and the opportunity for cross-examination. Therefore, there is probable cause to support the allegations of the complaint.

(*Id.*, p. 5).

### E. Denial of Overtime

Plaintiff also felt that he was denied overtime on March 17, 2017 because of his religion. (Dkt. No. 21-5, pp. 79–80). Plaintiff testified he was asked to run the snow blower and train an employee in Utica and guaranteed overtime for the job. (*Id.*, p. 79). Plaintiff testified that after shoveling 17 driveways, he and the employee, Jeff Sczmecko, were sent home instead of working overtime. (*Id.*, p. 80). Plaintiff testified that Chris Baker told them that they were no longer needed, and that the decision came from Mr. Baker's boss, Kerry Marring. (*Id.*, p. 112). Plaintiff testified that he felt "it was a discriminatory nature regarding my religious beliefs because it was an ongoing thing." (*Id.*, p. 103). Plaintiff testified that he had already filed charges and "felt that they were just continuing the discrimination process." (*Id.*, p. 80).

Plaintiff testified that on March 20, 2017, he spoke with another DOT employee, Bob Rice, about the overtime issue. (*Id.*). According to Plaintiff, he said that even if Plaintiff was denied overtime, they could have given it to Mr. Sczmecko. (*Id.*). Plaintiff testified that Mr. Rice asked him why Plaintiff worried about other people, and Plaintiff responded, "because my god tells me to." (*Id.*). Mr. Rice then allegedly put his hand on Plaintiff's shoulder and said, "so you're the chosen one." (*Id.*). Plaintiff interpreted this as a derogatory statement. (*Id.*, p. 110).

6

On April 9, 2017, Plaintiff's union representative filed a grievance with the DOT, regarding the "desperate [sic] treatment and peer harassment he experiences on a daily basis." (Dkt. No. 26-7, p. 2). In the grievance form, Plaintiff wrote:

> On March 14, 2017 I believe my rights were violated when I was removed from an active overtime snow removal assignment arbitrarily and capriciously without just cause and solely because of my religious affiliation. Since converting to Islam I have been harassed and disadvantaged. Being removed from this OT Snow Removal Assignment is a continuation of the religious discrimination I am being subjected to with full knowledge of the levels of both my supervisors and that of Region 2 DOT at large.

(Dkt. No. 26-8, p. 2). After a hearing, Plaintiff's grievance was denied on June 16, 2017. (Dkt. No. 26-12). In a written decision, Bernadette Ellis of the Employee Relations Bureau found that "the evidence supports management's denial of overtime." (*Id.*, p. 5).

### F. Administrative Leave & Retirement

On March 22, 2018, Plaintiff was issued a letter, authored by Ms. Entwistle, which advised him that he was being "placed on Administrative Leave With Pay effective immediately, March 22, 2018." (Dkt. No. 26-13, p. 2). According to Mr. Chaisson, Plaintiff had "posted inappropriate material on Facebook of a threatening nature and that based on that material, Mr. Schaaf needed to be removed from the worksite immediately." (Dkt. No. 21-3, ¶¶ 29–30). Plaintiff testified that "they made [this] up about me being a dangerous person at work. (Dkt. No. 21-5, p. 151). According to Plaintiff, the Facebook post related to his dissatisfaction with a Workers' Comp. case. (*Id.*, pp. 138, 157).

Plaintiff never returned to work after March 22, 2018, and ultimately, he retired on July 13, 2018. (Dkt. No. 21-5, p. 162). Plaintiff claims that he was forced to retire, and that "they encouraged me to leave and they never game me a reason why." (*Id.*, pp. 163–64). According to Plaintiff, they never told him what he was charged with, but said it was best for him to resign, and he did so because they promised to give him back hours for sick time. (*Id.*, p. 165).

7

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to

8

the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.  DISCUSSION

### A.  Religious Discrimination

#### 1.  Legal Standard

Plaintiff alleges that Defendant discriminated against him on the basis of his religion in violation of Title VII and NYSHRL. (Dkt. No. 1). Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . religion[.]" 42 U.S.C. § 2000e–2(a)(1). An individual's "religion" includes not just religious beliefs, but "all aspects of religious observance and practice," unless the employer demonstrates that it is unable to reasonably accommodate that observance or practice "without undue hardship on the conduct of the employer's business." *See* 42 U.S.C. § 2000e(j). Thus, "a plaintiff may claim a violation of religious discrimination under Title VII under theories of either disparate treatment or denial of reasonable accommodation." *St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 303 (E.D.N.Y. 2014) (citation omitted).

Disparate treatment religious discrimination claims under Title VII are evaluated under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Courts generally

9

employ the same analysis for discrimination claims under NYSHRL. *See Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003).

First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *Id.* The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 507. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: 1) he is a member of a protected class; 2) he was qualified for the position she held; 3) he suffered an adverse employment action; and 4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 497 (E.D.N.Y. 2012) (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 491–92 (2d Cir. 2009)).

### 2. Application

Here, Defendant argues that Plaintiff's discrimination claim must be dismissed because he has "failed to provide proof that he was subjected to an adverse employment action or that any such action was attributable to his religion." (Dkt. No. 21-1, p. 14).

In general, an adverse employment action is "a materially adverse change in the terms and conditions of employment." *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 304 (2d Cir. 2017) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). "To be materially adverse, a change in working conditions must be more disruptive than

a mere inconvenience or an alteration of job responsibilities." *Id.* "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.*; *accord Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (stating that an adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

Plaintiff claims that "Defendant's repeated failure to accommodate Plaintiff's religious practices, and indeed its affirmative interference in such practices led to a de facto failure to accommodate which was tantamount to an 'adverse employment action' sufficient to make out a prima facie case of religion discrimination." (Dkt. No. 26, p. 8). Plaintiff also suggests that he suffered an adverse action when he was denied overtime on one occasion. (*Id.*).

### a. Failure to Accommodate

Although Plaintiff now claims that Defendant failed to accommodate his religious beliefs by interfering with his right to pray and wear a kufi, the Complaint contains no such allegations. (Dkt. No. 1). Nor does Plaintiff claim that he ever requested an accommodation, such as the opportunity to pray in a designated place. (Dkt. No. 21-5, p. 45). To the extent Plaintiff argues that Defendant failed to intervene to stop the alleged abuse by DOT employees, that theory aptly describes his hostile work environment claim, which the Court will discuss below. Thus, Plaintiff cannot show an adverse action on this basis.[2]

---

[2] Nor can Plaintiff sustain a claim on the separate theory of discrimination based on failure to accommodate, which requires a showing that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *St. Juste v. Metro*

11

### b. Denial of Overtime

As to the overtime incident, Plaintiff has adduced evidence that he was removed from an OT Snow Removal Assignment on March 17, 2017. (Dkt. No. 21-5, pp. 79–80; Dkt. No. 26-8). Defendant argues that "the denial of one shift of overtime does not constitute an 'adverse action' under Title VII." (Dkt. No. 29, p. 7). Notably, "missing a small amount of overtime work assignments has been held insufficiently material to constitute an adverse employment action under Title VII." *Miller v. N.Y. State Police*, No. 14-CV-00393A(F), 2019 WL 7582838, at *10, 2019 U.S. Dist. LEXIS 143963, at *35, (W.D.N.Y. Aug. 22, 2019) (citing cases). Ultimately, it is up to the plaintiff to show that he was materially harmed by the action. *Id.* Here, Plaintiff has not identified the number of lost hours or wages to show how he was harmed in a material way. Therefore, he has failed to raise an issue of fact that he suffered an adverse action.

Moreover, even if the denial of overtime did constitute an adverse action, Plaintiff has not shown that it took place under circumstances giving rise to an inference of discrimination. Rather, the record shows that Plaintiff's co-worker Mr. Sczmecko, a non-Muslim, was also sent home instead of getting overtime. Plaintiff testified that the DOT employee who made the decision, Mr. Marring, never said anything about his religious beliefs. (Dkt. No. 21-5, p. 112). And any connection to Plaintiff's religion is attenuated by the decision of the Employee Relations Bureau, which found that, based on staffing and weather conditions at the time, "the evidence supports management's denial of overtime." (Dkt. No. 26-12). In sum, viewed in the light most favorable to Plaintiff, the record does not permit a rational inference that he was denied overtime because of his religion. Therefore, Plaintiff's claim of religious discrimination under Title VII and NSYHRL must be dismissed.

---

*Plus Health Plan,* 8 F. Supp. 3d 287, 315 (E.D.N.Y. 2014). Among other things, Plaintiff has not shown that he was disciplined for failure to comply with any employment requirement.

12

### A. Hostile Work Environment

#### 1. Legal Standard

Title VII also prohibits religious discrimination in the form of a hostile work environment. *See* 42 U.S.C. § 2000e-2(a). The hostile work environment standard "includes both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). Thus, the factors courts consider in evaluating whether a hostile work environment exists include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

To survive summary judgment on a hostile work environment claim, a plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [his] working environment." *Alfano*, 294 F.3d at 374 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000)). Additionally, the plaintiff must show "a specific basis for imputing the hostile work environment to the employer." *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001).

### 2. Application

Here, Defendant argues that Plaintiff's hostile work environment claim fails for two reasons: 1) Plaintiff has failed to establish that he was subjected to a hostile work environment; and 2) Plaintiff has failed to establish that any hostile work environment should be imputed to his employer. (Dkt. No. 21-1, pp. 16–26).

#### a. Environment

Plaintiff asserts that "being forced to work in an environment in which one is humiliated for wearing a religious cap, or harassed and outwardly taunted because of his religious beliefs (Muslim) if proven," could constitute a hostile work environment. (Dkt. No. 26, p. 10). Viewing the evidence in the light most favorable to Plaintiff, he experienced the following abusive conduct on account of his religion: 1) derogatory comments about his kufi; 2) unwanted touching and trying on of his kufi; 3) derogatory comments about Muslims being unclean; 4) derogatory comments about Muslims being terrorists; 5) interruptions of his prayer; 6) mocking gestures about prayer; 7) mocking jokes about his faith; and 8) threatening posts on Facebook about his faith. This occurred on multiple occasions, mostly in 2017. Plaintiff testified that he subjectively perceived this environment to be abusive and that it caused him extreme anxiety. (Dkt. No. 21-5, pp. 142–43). Although Plaintiff traveled for work and did not spend his time in a conventional office setting, he has adduced evidence of repeated abuse at various DOT facilities by numerous employees. Considering the severity, frequency, and degree of the abuse, the Court finds that an objective reasonable person could find that it altered the conditions of his employment for the worse.

Accordingly, viewing the evidence in the light most favorable to Plaintiff, there is an issue of fact as to whether his work environment was sufficiently hostile to violate Title VII. (*See also* Dkt. No. 26-9, New York State Division of Human Rights decision, finding issue of

material fact as to "whether complainant was subjected to a hostile work environment on the basis of his creed"); *Ahmed v. Astoria Bank*, 690 F. App'x 49, 51 (2d Cir. 2017) (concluding that a reasonable jury could find that the plaintiff was subject to a hostile work environment based on, *inter alia*, derogatory remarks about her religion, references to her hijab as a "rag," and comments that Muslim employees were "suspicious").

### b. Imputation

Next, Plaintiff argues that the hostile work environment should be imputed to Defendant because DOT "knew or should have known of the rampant discrimination against Plaintiff but failed to take adequate corrective action." (Dkt. No. 26, p. 11). Under this theory, Plaintiff must show that "the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino v. Bell A.*, 385 F.3d 210, 225 (2d Cir. 2004). Defendant claims that "when Plaintiff did complain, his complaints were immediately addressed and the alleged conduct never happened again." (Dkt. No. 29, p. 6). However, Plaintiff testified that "nobody listened" to his complaints and that he stopped reporting the harassment because "it wasn't doing me any good." (Dkt. No. 21-5, p. 94). The record shows that Defendant did investigate several incidents reported by Plaintiff, but only Mr. Cogden was disciplined for the alleged abuse. (Dkt. No. 21-3, ¶ 18). Notably, Plaintiff filed an internal DOT complaint in February 2017 regarding alleged abuse, but it is unclear what steps Defendant took to investigate and/or remedy the situation. (Dkt. No. 21-7). There is also evidence that, for at least some alleged instances of abuse, the supervisor of the offending employee was present but did not intervene. (Dkt. No. 26-9, p. 5).

Based on this record, the Court agrees with the New York State Division of Human Rights that issues of material fact exist as to "whether or not [Defendant] could be deemed to have known of a hostile work environment and condoned it by failing to cure the environment

15

from discriminatory animus; and whether [Defendant] exercised reasonable care in the handling of Complainant's internal complaint." (Dkt. No. 26-9, p. 5). Accordingly, Defendant is not entitled to summary judgment on Plaintiff's hostile work environment claim.[3] *See also George v. New York City Transit Auth.*, 496 F. Supp. 2d 231, 233 (E.D.N.Y. 2007) (denying summary judgment on hostile work environment claim where the plaintiff "raised triable issues of fact regarding whether the [defendant] took adequate remedial action in his case").

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 21) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Plaintiff's religious discrimination claims under Title VII and NYSHRL (Counts 1 and 2 of the Complaint) are **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendant's motion is **otherwise DENIED**; and it is further

**ORDERED** that Plaintiff's Title VII hostile work environment claim may proceed to trial against Defendant; and it is further

**ORDERED** that the Clerk of the Court is directed to provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York; and it is further

---

[3] Lastly, Defendant argues that Plaintiff's claims involving the alleged Mack incident, overtime incident, Rice statement, and Cyr incident should be dismissed for failure to exhaust administrative remedies because he did not mention them in his NYSDHR Complaint. (Dkt. No. 21-1, p. 27). The Court finds that these incidents, except for the denial of overtime, are all reasonably related to the hostile work environment alleged in the NYSDHR Complaint. (Dkt. No. 26-14). Therefore, Plaintiff may proceed on his hostile work environment claim with respect to the alleged incidents involving Mack, Rice, and Cyr. *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998) (recognizing that claims "reasonably related" to administrative complaint may proceed in federal action).

**ORDERED** that the Clerk of the Court is directed to confer with the parties to schedule a status conference in preparation for trial.

**IT IS SO ORDERED.**

Dated: January 22, 2020
       Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge